# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

LARRY JOHNSON, II,      )
                                     )
      **Plaintiff,**        )
                                     )
      **vs.**            )     **Case number 1:13cv0176 TCM**
                                     )
**CAROLYN W. COLVIN, Acting**   )
**Commissioner of Social Security,**   )
                                   )
      **Defendant.**      )

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Larry Johnson (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for SSI in August 2008, alleging he was disabled as of June 26, 2006, by a back injury and back spasms. (R.[1] at 200-03, 293.) His application was denied and his untimely request for a hearing was dismissed. (Id. at 71-72, 74-77, 84-85, 88-92.) Plaintiff applied again in August 2010 for DIB and SSI, alleging he was disabled as of September

_____

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

2008 by a back injury and five bulging discs in his back.  (Id. at 214-16, 222-25, 347.)  His applications were denied initially and after a May 2012 hearing and a September 2012 hearing held before Administrative Law Judge (ALJ) William E. Kumpe.  (Id. at 12-24, 32-64, 84-85, 94-98.)  The Appeals Council then denied Plaintiff's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and James Bordieri, Ph.D., testified at the first administrative hearing.  At that hearing, Plaintiff amended his alleged onset date to January 22, 2009.  (Id. at 255.)

Plaintiff has one year of college, is currently taking two classes, and has never been in special education.  (Id. at 39, 42.)

Plaintiff has only one criminal law violation, i.e., he was charged and fined in 2008 for unlawful use of drug paraphernalia.  (Id. at 35.)  After testifying that he uses marijuana once or twice a week to relieve his pain and depression, the ALJ decided to send him for a psychological evaluation and advised him to stop using marijuana before that evaluation.  (Id. at 36.)  The ALJ also decided to send Plaintiff for a physical evaluation.  (Id. at 40.)

Dr. Bordieri, testifying as a vocational expert (VE), described Plaintiff's past relevant work in terms of its skill and exertional requirements.  (Id. at 41-42.)

Plaintiff; J. Stephen Dolan, M.A., C.R.C.; Lee A. Fischer, M.D.; and Karyn B. Perry, Ph.D., testified at the second hearing.

Mr. Dolan, testifying as a VE, described Plaintiff's past relevant work as a mechanic as skilled and heavy, as a machinist as skilled and medium, and as a convenience store cashier as unskilled. (Id. at 52.) This last job was usually light but was heavy as Plaintiff described it because he had to unload a supply truck once a week. (Id.) His skills as a machinist and mechanic would transfer to the light level. (Id. at 53.)

Plaintiff testified that he last smoked marijuana two weeks earlier. (Id.) Before then, he was smoking it two or three times a week. (Id.) He has monthly appointments at the Advanced Pain Center (APC). (Id. at 56.) He does not use an assistive device such as a cane or walker. (Id. at 56, 63.) His pain medication "takes care of a lot of the pain but not all of it." (Id. at 56.) He can get around, but not repetitively and not for "very long periods of time." (Id.) He has a fifty-pound lifting restriction. (Id.) He is currently participating in a vocational rehabilitation program, but the only thing the program could do that would benefit him is help him financially to return to college. (Id. at 56-57.) He was then taking nine semester hours. (Id. at 62.) He sits down when his pain is bad enough. (Id. at 63.) He does not receive any special accommodations in class. (Id.)

Dr. Fisher testified that Plaintiff has low back pain, lumbo-sacral degenerative disc disease, and laminectomy syndrome. (Id. at 54.) The latter he described as being "a chronic pain syndrome related to the low back."[2] (Id.) These impairments did not meet or medically equal an impairment of listing-level severity. (Id.)

---

[2]Laminectomy syndrome, or post-laminectomy syndrome, "is characterized by residual and persistent back and/or leg pain following spine surgery." Spinal Research Foundation, Post-Laminectomy Syndrome, http://www.spinerf.org/learn/conditions/post-laminectomy-syndrome-0 (last visited Feb. 17, 2015).

Dr. Fisher further testified that Plaintiff would be limited to light physical exertional work. (Id.) Plaintiff had postural limitations of being able to occasionally bend, stoop, and climb stairs. (Id.) He should never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. (Id.) He should avoid unprotected heights. (Id.) He has no other physical limitations. (Id.) Dr. Fisher disagreed with the assessment of Dr. Kim that Plaintiff cannot do a combined eight-hour day between sitting, standing, and walking. (Id.) He thought such assessment was apparently based on Plaintiff's history and not on Dr. Kim's examination findings. (Id. at 55.) Dr. Fisher noted that Plaintiff's gait had been normal in June 2012. (Id.) He also did not believe that pain would cause Plaintiff to miss two or more days of competitive work in a thirty-day period. (Id.)

Asked about the reference in Plaintiff's medical records to positive straight leg raises, Dr. Fisher described the test as one that depends on a claimant's subjective symptoms. (Id. at 57-58.) He does not "put much stock" in the test. (Id. at 58.) Asked to identify in the record what he is relying on when concluding that Plaintiff does not experience such pain that he would miss two or more days of work a month, Dr. Fisher replied that there was nothing and that "[i]t's just that [he] [doesn't] know how anybody can predict how somebody would miss work." (Id.)

The ALJ then asked the VE to assume a hypothetical person of Plaintiff's age, education, and past work experience with the limitations described by Dr. Fisher and who is limited to light work. (Id. at 59.) Asked if such a person can perform any of Plaintiff's past relevant work, the VE replied that the maintenance and mechanic jobs would be eliminated.

(Id.)  The cashier job as described by Plaintiff would also be eliminated, but not as described in the *Dictionary of Occupational Titles* (DOT).  (Id. at 59-60.)  Other available jobs were cashiers, fast food counter workers, and housekeeping cleaners.  (Id. at 60.)

Dr. Perry testified that Plaintiff has a pain disorder and another disorder, the identity of which is not transcribed.  (Id. at 61.)  She opined that the applicable Listing was 12.04 (depression), but concluded that the disorder was not of the required severity.  (Id.)  He had no difficulties in his activities of daily living and only mild difficulties in social functioning and in concentration, persistence, or pace.  (Id. at 62.)  He had not had any episodes of decompensation.  (Id.)  Asked about a reference in the medical records to Plaintiff being recently diagnosed with anxiety, she testified that the diagnosis would not change her evaluation of how well Plaintiff was functioning.  (Id. at 63.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical and mental functional capacities.

On a Function Report, Plaintiff described what he does during the day.  (Id. at 355.)  He gets up at approximately 6:30 a.m., takes his morning medication, either stays up or goes back to bed for awhile depending on how well he slept, gets ready for college, attends classes most of the day, returns home, rests, does homework, watches television, and goes to bed around 10:00 p.m.  (Id.)  If he is having a bad day, he lies down occasionally throughout the day.  (Id.)  He washes the clothes of his son, a senior in high school, along with his and cooks

supper for them both and for his father.  (Id. at 356.)  He is frequently waken at night by pain and spasms.  (Id.)  He does not have any problem taking care of his personal hygiene.  (Id.) He does household chores of laundry, cleaning, and some mechanical repairs.  (Id. at 357.) He does not do any yard work.  (Id. at 358.)  He goes grocery shopping once or twice a week for one to two hours each time.  (Id.)  He does not have any problems getting along with others.  (Id. at 360, 361.)  His impairments adversely affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks.  (Id. at 360.)  He cannot walk farther than two or three hundred feet before having to stop and rest for five to ten minutes. (Id.)  He does not have any problems paying attention or following written or spoken instructions.  (Id.)  The only problem with his mental capacity is his depression and feelings of worthlessness.  (Id.)  He is always under stress, but can usually handle it okay.  (Id. at 361.)  Sometimes, however, he breaks down.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin on June 21, 2006, when Plaintiff went to the emergency room at the Poplar Bluff Regional Medical Center after experiencing low back pain when lifting an object weighing approximately 150 pounds at work.  (Id. at 407-18, 648-66.)  His past medical history included back surgery.  (Id. at 411.)  His pain was an eight on a ten-point scale.  (Id. at 412.)  X-rays of his lumbar spine revealed moderate spurring at L1-L2; moderate narrowing, spurring, and sclerosis at L5-S1; mild degenerative joint disease elsewhere; and no fracture.  (Id. at 412, 418.)  He was given an injection of Toradol, a nonsteroidal anti-inflammatory drug (NSAID), diagnosed with acute sciatica, and discharged with instructions

to follow up with his primary care physician in two days.  (Id. at 410, 41-13.)  Also, he was given prescriptions for Flexeril (a muscle relaxant), Lortab (a combination of acetaminophen and hydrocodone prescribed for the relieve of moderate to severe pain), and Naprosyn (an NSAID).  (Id. at 410, 412-13.)  At discharge his pain was a zero.  (Id. at 409.)

Six days later, Plaintiff consulted a nurse in the offices of L.J. Plunkett, Jr., M.D., for his low back pain that had started on June 21 and was radiating to the back of his left leg.  (Id. at 425, 633.)  His condition was mild; his symptoms were stable.  (Id.)  Authorization for a magnetic resonance imaging (MRI) of his back was obtained from his employer's worker's compensation carrier.  (Id.)  The MRI revealed degenerative changes in the L4-L5 and L5-S1 discs and asymmetrically narrowed neural foramen at L5-S1.  (Id. at 427-30, 588-89.)  There was no evidence of spinal canal or neural foraminal stenosis at the other levels.  (Id. at 429.)

After seeing the nurse at Dr. Plunkett's office again on July 3 for complaints of continuing muscle spasms and severe low back pain, Plaintiff was referred to a neurosurgeon for a consultation and prescribed Vicodin (a combination of acetaminophen and hydrocodone) and Soma (a muscle relaxer).  (Id. at 431-32, 632.)

Subsequently, on August 10, Plaintiff saw Jeffrey A. Kornblum, M.D.  (Id. at 435-37.)  He complained of back pain and bilateral leg pain, worse on the left than the right.  (Id. at 435.)  His back pain was worse than his leg pain.  (Id.)  He had been out of medication for the past week and a half and was unable to get refills.[3]  (Id.)  He walked with a

_____

[3]Plaintiff's July 24 request for a refill of his Vicodin, last refilled eleven days earlier, was denied.  (Id. at 434.)  A refill of Soma had been offered and declined on the grounds he had already had it refilled.  (Id.)  The last refill of Soma was prescribed the same day as the last refill of Vicodin.  (Id. at 433.)

"significant[ly] guarded and antalgic gait." (Id.) He could not toe walk on his left side. (Id.) He had shortness of breath on exertion, which he attributed to smoking one pack of cigarettes a day. (Id.) Dr. Kornblum recommended a structured physical therapy course, refilled his prescriptions for pain medication and a muscle relaxer, and prescribed a steroid dose pack. (Id.)

Plaintiff was evaluated for physical therapy on August 22 and was to participate in that therapy three times a week for three weeks. (Id. at 542-46.) Plaintiff had physical therapy on August 24, 27, 31, September 5, and 6, but did not return thereafter. (Id. at 547-55.)

Plaintiff returned to Dr. Kornblum on September 7, reporting continuing back pain radiating to his left buttock and, occasionally, to his left leg. (Id. at 438.) He had run out of his medications and was regularly doing the exercises shown him by the physical therapist. (Id.) On examination, his gait was guarded but not as antalgic as before. (Id.) Straight leg raises were positive, more on the left than on the right. (Id.) His strength was 5/5. (Id.) His reflexes were asymmetrical; he had a diminished left Achilles reflex. (Id.) Various treatment options, including surgery, were discussed; David L. Phillips, M.D., was to be consulted about the surgical procedure. (Id.)

Plaintiff's gait was less guarded when he saw Dr. Kornblum on October 24, but his range of motion in his lumbar spine was decreased, his straight leg raises were positive, and his reflexes were asymmetrical. (Id. at 439-40.) He was to have an L5 anterior lumbar interbody fusion. (Id. at 439.)

Plaintiff underwent the fusion, performed by Drs. Kornblum and Phillips, on November 6. (Id. at 443-49, 590-601.)

On December 12, Plaintiff went to the emergency room at Ripley County Memorial Hospital (Ripley) with complaints of a right earache. (Id. at 620-23.) His current medications were Tylenol, Flexeril, and hydrocodone. (Id. at 621.) He was treated with an antibiotic and discharged. (Id. at 623.)

At a follow-up visit to Dr. Kornblum two days later, Plaintiff reported that he was continuing to have intermittent left-sided pain when he sits and relaxes, but not when he is "up and around." (Id. at 450-51.) He had been out of narcotic pain medication for four to five days. (Id. at 450.) His gait appeared to be normal; his motor examination was 5/5. (Id.) He was given a prescription for Flexeril and for hydrocodone. (Id.) The latter was to be taken intermittently and not round the clock. (Id.) Dr. Kornblum informed Plaintiff that he should not do the lifting required by his job – 50 to 100 pounds – for six to twelve months after the surgery. (Id.) X-rays showed "[s]atisfactory anterior compression plate and screw and interbody fusion at L5-S1" and "[m]ild degenerative disc disease at L4-L5 and L1-L2." (Id. at 451.)

Plaintiff was described by Dr. Kornblum when he saw him on January 25, 2007, as "doing quite well." (Id. at 452-53, 607.) He was encouraged to stop smoking, restricted to lifting no more than thirty pounds, and was not to do any repetitive lifting. (Id.) X-rays showed the fusion to be as before and also revealed "[m]oderate degenerative disc disease at T12-L1 and L1-L2." (Id. at 453.)

In April, Plaintiff reported to Dr. Kornblum that he had been having significant increasing pain in his low back and in his left leg and flank in the past one to two months. (Id. at 470-73, 606.)  On examination, his gait was "reasonably brisk," but appeared to be guarded on his left side.  (Id. at 470.)  Straight leg raises were positive; a Fabere maneuver was negative.[4]  (Id.)  His motor examination was 5/5 throughout his lower extremities.  (Id.) Dr. Kornblum prescribed Zanaflex (a short-acting muscle relaxer) and Ultram (a pain reliever).  (Id.)  X-rays revealed scoliosis and degenerative disc disease at L1-2 in addition to the fusion.  (Id. at 471-72.)  Plaintiff was to return to Dr. Kornblum after undergoing a computed tomography (CT) scan of his lumbar spine.  (Id. at 470.)

On June 22, Plaintiff was seen by John David Graham, M.D., of the Pain Treatment Center, Inc.  (Id. at 477-503, 505.)  Plaintiff reported that he was "doubling up" on the Zanaflex and Ultram and was occasionally also taking hydrocodone tablets he got from his father.  (Id. at 478.)  On examination, he had, "[a]t most," mild tightness in his lumbar paraspinous musculature.  (Id. at 479.)  He had a good range of motion in his back, symmetrical reflexes in his knees and ankles, and negative straight leg raises to 80 degrees bilaterally in a seated position.  (Id.)  He could stand on his toes and heels without difficulty. (Id.)  Dr. Graham expressed concern about Plaintiff's use of his medications and his failure to stop smoking, noting that he ran an increased risk of failed fusion by doing so.  (Id.)  He construed these behaviors as indications that Plaintiff was not "willing to work with the

---

[4] A positive Fabere's sign indicates the presence of sacroiliac joint dysfunction in patients with lower back pain.  See Dorland's Illustrated Medical Dictionary, 1896 (32nd ed. 2012).  The word "Fabere" is derived from "the initial letters of the movements necessary to elicit [the sign]:  flexion, abduction, external rotation, extension."  Id.

medical providers to maximize his recovery." (Id. at 480.) He recommended that Plaintiff start on a brief course of Darvocet[5] to be taken as needed for pain and Elavil to be taken at bedtime. (Id.) If the test scheduled for the next week showed evidence of fusion, the Darvocet was to be discontinued and Plaintiff was to be prescribed Ultram. (Id.) He strongly recommended that Plaintiff stop smoking. (Id.) He noted that a self-administered psychologic test, the Symptom Checklist-90-Revised, given to Plaintiff showed "an elevation into the clinical range of his somatization scale, his depression scale, and anxiety scale." (Id.) These could make his subjective complaints out of proportion to the objective findings. (Id. at 481.) A urine screen was positive for benzodiazepines, oxycodone, marijuana, and tramadol; however, no prescriptions for any were listed and, as to the marijuana, second hand smoke would be insufficient to produce the result. (Id. at 502.)

Six days later, Plaintiff returned to Dr. Kornblum. (Id. at 506-10, 604-06.) The CT scan revealed a normal alignment of Plaintiff's lumbar spine; maintained vertebral body heights; mild disc space narrowing at the L1-L2 level with mild anterior spondylotic ridging/marginal spurs; left posterolateral spurring and moderate facet arthropathy bilaterally at L5-S1; and subtle broad-based central and questionable minimally right paracentral protrusion at L4-L5. (Id. at 508-09.) On examination, Plaintiff moved well, although he appeared to be uncomfortable, had positive straight leg raises, and had 5/5 strength in his lower extremities. (Id. at 506.) He was started on Elavil. (Id.) Physical therapy was

---

[5]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Feb. 11, 2015). It was withdrawn from the United States market in November 2010. Id.

recommended, and an electromyogram (EMG) nerve conduction study was to be performed. (Id.)  The study, performed on July 5, was normal.  (Id. at 511-14, 602-03, 612.)

Plaintiff was seen again by Dr. Graham on July 16, reporting that he had discontinued the Elavil without notifying the office.  (Id. at 515-27.)  Dr. Graham noted that Plaintiff's previous urine screen was positive for Valium, Percocet, hydrocodone, Ultram, and marijuana. (Id. at 515.)  Plaintiff had reported that he had not used Ultram or hydrocodone in several days; consequently, they should not have shown up in his urine.  (Id.)  The Valium and Percocet should not have shown up because he had no history of taking either and had no explanation for their presence.  (Id.)  Dr. Graham expressed concern about Plaintiff being noncompliant and not being truthful.  (Id.)  He noted that the CT scan had no significant findings.  (Id. at 516.)  Plaintiff was started on Naprosyn and given a prescription for Ultram. (Id. at 516, 527.)  Another urine drug screen was performed.  (Id. at 516-23.)  Plaintiff was found to be at maximum medical improvement and was released to return to work "without restriction from pain management."  (Id. at 526.)

Plaintiff was evaluated again for physical therapy on July 13 and participated in twenty sessions between July 17 and September 26, inclusive.  (Id. at 556-82.)

While doing physical therapy, Plaintiff saw Dr Kornblum on July 19.  (Id. at 528, 561.)  He was feeling somewhat better "overall," but still had back discomfort.  (Id.)  His right leg had been bothering him recently; his left leg and hip had been bothering him worse than the right.  (Id.)  His strength was 5/5; his straight leg raises were negative.  (Id.)

On September 1, Dr. Kornblum released Plaintiff from work until November 1. (<u>Id.</u> at 529.)

Five days later, Plaintiff underwent an orthopedic evaluation by Michael C. Chabot, D.O., at the request of the worker's compensation insurance carrier. (<u>Id.</u> at 531-36, 615-19.) Plaintiff reported having low back pain that radiated to both extremities, was a five on a ten-point scale, and was aggravated by sitting, lying down, and resting. (<u>Id.</u> at 531.) On examination, Plaintiff did not walk with a limp, could heel and toe walk, and did not use a cane or walker. (<u>Id.</u> at 534.) He had 5+/5+ motor strength bilaterally. (<u>Id.</u>) Straight leg raises and a Fabere's test were negative. (<u>Id.</u>) He could forward flex his lumbar spine to 90 degrees, extend to 30, and side bend to 60. (<u>Id.</u>) His deep tendon reflexes were symmetric. (<u>Id.</u>) Dr. Chabot's impression was of back pain and status-post anterior lumbar interbody fusion at L5-S1. (<u>Id.</u> at 535.) He recommended that Plaintiff undergo a lumbar myelogram and a post-myelogram CT with sagittal and coronal reconstructions in order to evaluate him for additional neural compression and to evaluate the prior fusion. (<u>Id.</u>) He also recommended that Plaintiff participate in a work-hardening program. (<u>Id.</u>)

When seeing Dr. Kornblum in November, Plaintiff reported continuing backaches, for which he took Tylenol, albeit not on a daily basis, because he had run out of his Ultram in September. (<u>Id.</u> at 537-40, 608-09.) He continued to smoke. (<u>Id.</u> at 537.) Dr. Kornblum noted that Plaintiff had some "secondary issues of depression" but resisted taking any medication for it. (<u>Id.</u>) Plaintiff was advised to see a psychologist or psychiatrist, maintain his exercise program, and add twenty minutes of aerobic activity to his exercise regimen.

(Id.)  He was restricted to lifting no more than fifty pounds.  (Id. at 537, 540.)  X-rays showed a stable minimal retropulsion of graft material at L5-S1, stable mild rotatory levoscoliosis, and no evidence of instability on flexion/extension.  (Id. at 538.)

In December, Dr. Chabot reviewed a Functional Capacity Evaluation of Plaintiff.[6]  (Id. at 541, 614.)  He found that Plaintiff was capable of only medium work, opined that it was unlikely Plaintiff could return to his former work as a grinder operator requiring that he lift up to 200 pounds, and concluded that he had reached maximum medical improvement.  (Id.)

Plaintiff was treated at the Ripley emergency room on February 12, 2008, for low back pain.  (Id. at 624-27.)

The following week, on February 20, Plaintiff was seen by Dr. Plunkett for his low back pain and prescribed Valium, Soma, and Vicodin.  (Id. at 631.)  His condition was mild; his symptoms were stable.  (Id.)  In April, Dr. Plunkett treated Plaintiff for his low back pain and acute sinusitis.  (Id. at 630.)  His prescriptions were renewed.  (Id. at 636.)  When Plaintiff saw Dr. Plunkett the next month, on May 15, he reported that he had started work as a cook and requested, and received, a three-month refill of his medications.  (Id. at 629, 636.)

Plaintiff reported to Dr. Plunkett on August 7 that his back pain was about the same; his depression was stable.  (Id. at 628.)  Depression, in addition to low back pain, was on the list of diagnoses.  (Id.)  His prescriptions were renewed.  (Id. at 628, 636.)

---

[6]See id. at 455 to 469.

When seeing Plaintiff three weeks later, Dr. Plunkett reviewed his lab work with him, informed him that his cholesterol levels were up, and advised him to watch his diet and to exercise.  (Id. at 678.)  Plaintiff's back pain had increased; Lorcet was to be tried instead of Vicodin.  (Id.)

Plaintiff's lab work was repeated on October 28.  (Id. at 677, 692.)  When seeing a nurse in Dr. Plunkett's office, Plaintiff reported he had been on a diet.  (Id. at 677.)  In addition to his back pain, he complained of sinus congestion and pressure.  (Id.)

Plaintiff complained to Dr. Plunkett on December 8 of low back pain and stress.  (Id. at 676.)  His back pain was described as stable; low back pain was his only diagnosis.  (Id.)  His prescriptions were refilled.  (Id.)

The following month, January 2009, Plaintiff reported to Dr. Plunkett that he had lost some weight, was out of work, and was under stress.  (Id. at 675.)  He did not want to start an antidepressant at that time.  (Id.)  His diagnoses were low back pain and depression.  (Id.)

Plaintiff consulted Dr. Plunkett in February about a knot on his left elbow and numbness in his left hand.  (Id. at 674.)  The knot was thought to be a ganglion and was going to be watched.  (Id.)  His medications were refilled.  (Id.)

Plaintiff saw Dr. Plunkett in March for a cold and sinus congestion, in addition to his low back pain and depression.  (Id. at 673.)  His condition was mild; his symptoms were stable.  (Id.)  The next month, Plaintiff consulted him only for low back pain and depression.  (Id. at 672.)  He was "a little more depressed" due to a failed relationship.  (Id.)  He was

excited about starting college in the fall.  (Id.)  In addition to his other medications, he was prescribed Prozac, an antidepressant.  (Id.)

In May, Plaintiff reported to Dr. Plunkett that he had done well on the Prozac but needed "a little more boost"; the dosage was increased; the other medications were renewed. (Id. at 671.)  He reported the next month that he had started school and was feeling better and less depressed.  (Id. at 670.)  His condition was described as moderate; his symptoms as having worsened.  (Id.)  Plaintiff was described as generally doing well when seen by Dr. Plunkett in July.  (Id. at 669.)  His condition and symptoms were described as they had been in June.  (Id.)

When Plaintiff saw Dr. Plunkett in January 2010 for depression, he was prescribed Xanax in addition to the Soma, Lorcet, and Prozac and was to be referred to a pain specialist. (Id. at 668.)

Plaintiff returned to Dr. Plunkett on February 26 for refills of his prescriptions.  (Id. at 667.)  It was noted that he had an appointment with the specialist the next month.  (Id.)  He was informed that he would receive no further medication refills.  (Id.)

On March 19, on Dr. Plunkett's referral, James DeVoe, M.D., with APC, evaluated Plaintiff's complaints of chronic low back pain with leg pain.  (Id. at 688-91, 693-96, 771-74.) Plaintiff described the pain as aching, sharp, and a five on a ten-point scale.  (Id. at 688.) When present, it interfered with some activities of daily living but not with sleep.  (Id.)  Its intensity varied, but was never less than a three or worse than a nine.  (Id.)  It was aggravated by all physical activities, coughing, and any low back movement; it was eased by lying down

and massage.  (Id.)  On examination, he was well groomed and cooperative.  (Id.)  He was alert and oriented to time, place, person, and situation.  (Id.)  His gait was well coordinated and normal.  (Id. at 688, 689.)  Straight leg raises were positive on the left at 45 degrees and on the right at 60 degrees.  (Id. at 689.)  A hyperextension test for pain was positive.  (Id.)  His muscle strength, patellar reflexes, and Achilles reflexes were all normal.  (Id.)  He had mild muscle tenderness in the paraspinous area and muscle spasms.  (Id.)  Dr. DeVoe diagnosed Plaintiff with lumbar discogenic pain; lumbar facet arthropathy/degenerative disc disease/spondylosis; post-surgical lower back pain; and osteoarthritis.  (Id. at 690.)  Plaintiff was to continue his home exercise program as tolerated and stop smoking.  (Id. at 689.)  He was prescribed gabapentin (used to treat nerve pain) and Flexeril and was to return in two weeks.  (Id. at 690.)

Plaintiff did return, seeing another physician, Abdul N. Naushad, M.D., with APC, on April 1.  (Id. at 706-08, 768-70.)  On examination, his gait, station, orientation, judgment, and insight were all normal.  (Id. at 706.)  He was tender in the paraspinous muscles and had diffusely mild bilateral muscle spasms.  (Id.)  He was prescribed Flexeril, gabapentin, and hydrocodone-acetaminophen.  (Id. at 707.)  His activities of daily living, including physical and overall functioning, were all better.  (Id.)  Plaintiff was advised to lose weight and stop smoking.  (Id.)

Seven days later, he saw Dr. DeVoe and received a transforminal epidural injection in his lumbar spine.  (Id. at 766-67.)

Plaintiff saw Dr. Naushad again on May 3.  (Id. at 703-05, 763-65.)  His examination findings were as before, with the added finding that he was severely tender off the midline of his sacral spine.  (Id. at 703.)  He reported that the injection had caused more, not less, pain.  (Id. at 705.)

On June 1, Plaintiff saw Krishnappa A. Prasad, M.D., a physician with APC, for a refill of his prescriptions.  (Id. at 709-11, 760-62.)  His prescription for Flexeril was cancelled; etodolac, another NSAID, was prescribed instead.  (Id. at 710.)

The notes of Plaintiff's June 28 visit to Dr. Naushad are similar to the earlier notes with an additional examination finding of pain radiating down his left lower extremity to his calf and ibuprofen being added to his prescriptions, which included Flexeril instead of etodolac.  (Id. at 700-02, 757-59.)

Plaintiff saw Dr. Naushad again on July 26, reporting that the pain medications were helping to manage his pain and were improving his functioning and sleep.  (Id. at 697-99, 718-20, 754-56.)  There were no side effects; he had no new complaints.  (Id. at 697.)  On examination, he was as before.  (Id. at 697-98.)  A drug urine test was negative for opiates.  (Id. at 699.)  Plaintiff was given information on a spinal injection.  (Id.)

On August 24, Plaintiff saw Dr. Naushad for a refill of his prescriptions.  (Id. at 717, 753.)  No information was taken; other than his blood pressure, no examination was done.  (Id.)

Plaintiff again saw Dr. Naushad for a refill of his prescriptions on September 20.  (Id. at 714-16, 750-52.)  On examination, he much as before.  (Id. at 714.)  His functioning was

again described as "better."  (Id. at 715.)  There were no medication side effects.  (Id.)  On a ten-point scale, his pain was a three or four.  (Id.)

On October 18, Plaintiff reported no new symptoms or adverse side effects to Dr. Naushad.  (Id. at 747-49.)  The effectiveness of his medications on his pain was "somewhat" greater.  (Id. at 747.)  His pain, however, was a five.  (Id. at 749.)  His functioning was "better"; his examination findings were similar to those of previous visits.  (Id. at 748-49.)  Plaintiff refused any procedures.  (Id. at 749.)  His prescriptions were renewed.  (Id. at 748.)

On November 11, Plaintiff consulted George Samuel, M.D., to establish him as his primary care physician.[7]  (Id. at 733-35, 737-39.)  His present complaints were of a back injury, depression, and anxiety.  (Id. at 734.)  He smoked one pack of cigarettes a day.  (Id.)  He reported that the Prozac was not helping his depression.  (Id. at 737.)  On examination, his low back and right rib cage were tender.  (Id.)  X-rays of his lumbar spine revealed mild scoliosis; mild degenerative arthritis; and probable discectomy and fusion with plate and screws anteriorly at L5-S1 level.  (Id. at 738.)  X-rays of his right ribs were normal.  (Id. at 739.)  He was prescribed Cymbalta, an antidepressant, and Valium and was to return as needed.  (Id. at 737.)

Six days later, Plaintiff was seen by Ross D. Andreassen, M.D., another physician with APC.  (Id. at 744-46.)  His pain level was a six, but was reportedly "somewhat improved" on his medications.  (Id. at 744.)  His diagnoses and prescriptions were unchanged. (Id. at 745.)  A caudal injection was discussed; Plaintiff deferred a decision.  (Id. at 746.)

---

[7]Plaintiff explained in a report hat he went to Dr. Samuel after Dr. Plunkett died.

Plaintiff returned to Dr. Samuel on December 10, requesting an increase in his dosages of Cymbalta and Valium because his depression was worse. (<u>Id.</u> at 736.) His request was granted. (<u>Id.</u>) He was to return in one month. (<u>Id.</u>)

Five days later, Plaintiff saw Dr. Andreassen. (<u>Id.</u> at 741-43.) There was no change in his functioning, his examination findings, or his prescriptions. (<u>Id.</u> at 741-42.) His pain was a four. (<u>Id.</u> at 743.)

Plaintiff reported to Dr. Samuel on January 10, 2011, that his depression was better, his back pain was not. (<u>Id.</u> at 828.) On examination, his low back was tender. (<u>Id.</u>) His prescriptions were renewed; a CT scan of his spine was to be performed. (<u>Id.</u>)

Two days later, when Plaintiff next saw Dr. Andreassen, no information was taken; no changes were made to his medications. (<u>Id.</u> at 810-12.) His functioning was as before, with the exception that his sleep patterns were described as "fair" and not "better." (<u>Id.</u> at 811.) His pain was again a four. (<u>Id.</u>) He was to continue with his home exercise program and stop smoking. (<u>Id.</u>) Similarly, there were no changes in Plaintiff's examination findings when seen again the next month, other than his sleep patterns were again "better." (<u>Id.</u> at 807-09.)

The day after seeing Dr. Andreassen, Plaintiff saw Dr. Samuel. (<u>Id.</u> at 827.) His nerves and depression were better, although he was having occasional headaches. (<u>Id.</u>) Lisinopril, for high blood pressure, was added to his medications after his blood pressure was found to be high. (<u>Id.</u>) Uncontrolled hypertension was added to his diagnoses. (<u>Id.</u>)

In February, at Dr. Andreassen's request, x-rays were taken of Plaintiff's lumbar and thoracic spine, revealing the status-post anterior spinal fusion at L5-S1, moderate degenerative changes at L1-L2, a minimal anterior compression fracture of T11, and mild anterior degenerative spurring in the mid and lower thoracic spine. (Id. at 841-42.) One of the inferior fixation screws in the fusion appeared to be fractured. (Id. at 841.) It was noted that no previous examinations were available for comparison. (Id.)

At his March 9 visit to Dr. Andreassen for medication refills no information was taken. (Id. at 804-06.) The next day, Plaintiff reported to Dr. Samuel that his back pain was not much better. (Id. at 826.) His prescriptions were renewed. (Id.)

Plaintiff was seen at APC on April 6 for refills of his prescriptions. (Id. at 801-03.)

Plaintiff appeared anxious when he saw Dr. Samuel on April 11. (Id. at 825.) His prescriptions were renewed. (Id.)

CT scans of Plaintiff's lumbar and thoracic spine performed on April 14 at Dr. Andreassen's request revealed degenerative changes with slight narrowing of the intervertebral disc space at L1-L2 with Schmorl's nodes[8] present; mild multilevel facet arthropathy; and foraminal stenosis Grade II at left L5-S1. (Id. at 839-40.) There was no disc protrusion and no evidence of canal compromise. (Id.)

At his May visit to APC, Plaintiff rated his pain as a three to four. (Id. at 798-800.) The findings were otherwise as before. (Id.)

---

[8]A Schmorl's node is "[a]n upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae." Definition of Schmorl's Node, http://www.medicinenet.com/script/main/art.asp?articlekey=14007 (last visited Feb. 12, 2015). They are common, "especially with minor degeneration of the aging spine." Id.

The next day, he saw Dr. Samuel to have his cholesterol levels checked and was diagnosed with hyperlipidemia, depression, and anxiety.  (Id. at 824.)  He was to return as needed.  (Id.)

On June 2, Plaintiff reported to Dr. Andreassen that he could not function well without pain medications.  (Id. at 795-97.)  His pain was mild to moderate and, sometimes, severe.  (Id. at 795.)  His pain was aggravated by any physical activity and relieved by rest and medications.  (Id.)  It was both dull and sharp and was localized with occasional radiation.  (Id.)  There were no medication side effects.  (Id.)  His pain was a four.  (Id. at 797.)  As before, his prescriptions were renewed with a quantity for each medication for twenty-eight days and no refills.  (Id. at 796.)

Plaintiff consulted Dr. Samuel on June 6 for problems with his right shoulder.  (Id. at 823, 829.)  An x-ray revealed moderate degenerative arthritis in his acromioclavicular joint.  (Id. at 829.)

When seeing Dr. Andreassen on June 30 for prescription refills, Plaintiff's chief complaint was "computer issues."  (Id. at 792-94.)  He had no other new complaints.  (Id. at 794.)  He was given refills of his medications for twenty-eight days.  (Id. at 793.)

When seeing Dr. Samuel on July 6, Plaintiff requested that the lisinopril be discontinued because he was concerned about possible kidney and liver problems.  (Id. at 822.)  It was.  (Id.)  His prescriptions for Cymbalta and Valium were renewed.  (Id.)

At his July 28 visit to APC, Plaintiff reported he was "doing good" that day.  (Id. at 789.)  His pain was a three.  (Id.)

At his August 5 visit to Dr. Samuel, Plaintiff reported that his nerves and depression were better.  (<u>Id.</u> at 821.)  Dr. Samuel recommended that he consider physical therapy.  (<u>Id.</u>)

Plaintiff informed Dr. Andreassen on August 25 that his pain level had increased to a five.  (<u>Id.</u> at 786-88.)  The quantity of his medication prescriptions was for thirty, not twenty-eight, days.  (<u>Id.</u> at 787.)  A notation reads that Plaintiff had "consulted many neurosurgeons but no one will take him as a patient."  (<u>Id.</u> at 788.)  As before, he had Medicaid.  (<u>Id.</u> at 786.)

When seeing Dr. Samuel on September 6 for a refill of his medications, Plaintiff reported that his depression and nerves were getting better.  (<u>Id.</u> at 820.)  At his September 23 visit to Dr. Andreassen Plaintiff had no new complaints; however, his pain was a six.  (<u>Id.</u> at 784-85.)

In October, he saw Dr. Samuel for a refill of medications.  (<u>Id.</u> at 819.)  He also saw Dr. Andreassen later that month for medication refills; no information was taken.  (<u>Id.</u> at 782-83.)

Plaintiff complained to Dr. Samuel on November 8 of pain in his back and fingers, explaining that he had hurt himself when working on his car.  (<u>Id.</u> at 818. )  He requested pain pills, and was advised to consult Dr. Naushad.  (<u>Id.</u> at 818.)  X-rays of his lumbar spine showed anterior compression deformity of L1 with degenerative disc disease of L1-L2 and the prior surgery at the lumbosacral junction with left-sided facet arthrosis.  (<u>Id.</u> at 830.)

Plaintiff did consult Dr. Naushad on November 21.  (<u>Id.</u> at 779-81.)  He had no new complaints; his description of his pain, which was a nine, was unchanged.  (<u>Id.</u>)

Plaintiff told Dr. Samuel when seeing him on December 8 that he was not feeling well and requested an MRI or CT scan. (<u>Id.</u> at 817.) Subsequently, an MRI of his lumbar spine was performed on January 3, 2012, revealing minimal disc bulge at L1-L2 without significant stenosis; a small left foraminal annular fissure at L3-L4 with slight protrusion and no nerve root compression; a central annular fissure/minimal protrusion at L4-L5 and facet arthropathy without significant stenosis; and anterior fusion and left arthopathy at L5-S1 without significant central stenosis. (<u>Id.</u> at 816.) The vertebral alignment and marrow signal intensity at the anterior fusion at L5-S1 was within normal limits. (<u>Id.</u>) There was no fracture. (<u>Id.</u>)

On January 9, Plaintiff returned to Dr. Samuel's office for a recheck of his blood pressure. (<u>Id.</u> at 815.)

Plaintiff had no new complaints again when he saw Dr. Andreassen on January 20. (<u>Id.</u> at 776-78.) His back pain was a seven after moving furniture. (<u>Id.</u> at 778.) He was told to stop smoking. (<u>Id.</u> at 777.)

When Plaintiff saw Dr. Samuel on February 8, he reported that he had been feeling better and his nerves and depression were better. (<u>Id.</u> at 814.) He was diagnosed with anxiety and depression. (<u>Id.</u>) His prescriptions for Cymbalta and Valium were renewed. (<u>Id.</u>)

On February 20, Plaintiff reported to Dr. Naushad that his pain was a seven and radiated to both legs. (<u>Id.</u> at 837.) His prescription for hydrocodone-acetaminophen was renewed. (<u>Id.</u>)

Plaintiff reported to Dr. Samuel on March 7 that he had been stressed. (<u>Id.</u> at 844.) His diagnoses and prescriptions were unchanged from the February visit. (<u>Id.</u>)

Plaintiff's pain was a four when he saw Dr. Andreassen on March 21.  (Id. at 834-36, 848-50.)  He was reportedly symptom free.  His prescriptions for Flexeril and hydrocodone-acetaminophen were refilled.  (Id. at 835.)  His examination findings and description of his pain were as before.  (Id. at 834-35.)  His overall functioning was "fair."  (Id. at 836.)  It was noted that Plaintiff had "tried to get in with multiple surgeons and no one will take him since he had previous surgery in Arkansas."  (Id. at 836, 850.)

Plaintiff saw Dr. Samuel on April 6 for a cough and medication refills.  (Id. at 895.)  Later that month, he saw Dr. Andreassen for medication refills; his pain was a six.  (Id. at 846-47.)  On May 7, he again saw Dr. Samuel for medication refills.  (Id. at 894.)

Nine days later, Plaintiff complained to Dr. Naushad of low back pain radiating to his left leg.  (Id. at 885-87.)  The pain was a five.  (Id. at 885, 887.)  His functioning in his activities of daily living was "better," with the exception of his overall functioning, which was "OK."  (Id. at 887.)  Plaintiff's prescription for hydrocodone-acetaminophen was refilled.  (Id. at 886.)

Plaintiff told Dr. Samuel on June 6 that he was doing okay; the Cymbalta and Valium were helping.  (Id. at 893.)  One week later, he told Dr. Andreassen that his pain was again a five.  (Id. at 882-84.)  On examination, his gait and station were normal.  (Id. at 882.)  He was able to exercise.  (Id.)  His prescriptions for hydrocodone-acetaminophen and gabapentin were refilled.  (Id. at 883.)  Flexeril was discontinued; methocarbamol, another muscle relaxant, was prescribed.  (Id.)  His functioning levels were as before.  (Id.)  On June 29, he

returned to Dr. Samuel for a refill of his prescriptions. (Id. at 892.) He had low back pain, depression, anxiety, and uncontrolled hypertension. (Id.)

When seen by Dr. Andreassen on July 11, Plaintiff rated his pain as a four and the effectiveness of the hydrocodone-acetaminophen as "good." (Id. at 879-81.) The methocarbamol was discontinued because Plaintiff wanted to stay on Flexeril; his other two medications were renewed. (Id. at 880, 881.) It was noted that they were helping. (Id. at 880.)

In August, Plaintiff saw Dr. Samuel for his chronic low back pain and anxiety and for medication refills. (Id. at 891.) He also saw Dr. Andreassen, rating his pain as a five and obtaining refills of his prescriptions. (Id. at 876-78.)

Also before the ALJ were assessments of Plaintiff's mental and physical residual functional capacities.

Pursuant to his 2008 application, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Melissa Guilliams, a single decisionmaker.[9] (Id. at 65-70.) The primary, and only, diagnosis was "disorders of the back." (Id. at 65.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and walk, sit, or stand for approximately six hours during an eight-hour workday. (Id. at 66.) His ability to push and pull was otherwise unlimited. (Id.) He had postural limitations of being able to frequently,

---

[9]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

i.e., at least two-thirds of the time, balance, stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds. (Id. at 68.) He had no manipulative, visual, or communicative limitations. (Id. at 68-69.) He had one environmental limitation – he needed to avoid concentrated exposure to vibration. (Id. at 69.)

In October 2010, a PRFCA was completed by another single decisionmaker, Bethany Winschel. (Id. at 78-83.) The primary diagnosis was status-post fusion at L5; the secondary diagnosis was degenerative disc disease. (Id. at 78.) These impairments resulted in the same exertional limitations as previously found. (Id. at 79.) He had no postural limitations. (Id. at 80.) As before, he also had no manipulative, visual, or communicative limitations and only the one environmental limitation. (Id. at 80-81.)

The same month, a Psychiatric Review Technique form was completed by Paul Lloyd, Ph.D. (Id. at 721-31.) Dr. Lloyd assessed Plaintiff as having anxiety and an affective disorder, i.e., depression. (Id. at 721, 724, 725.) These disorders did not result in any functional limitations, including in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Id. at 729.) Nor did they cause any episodes of decompensation of extended duration. (Id.)

After the first hearing and as directed by the ALJ, Plaintiff was evaluated by Chul Kim, M.D., in June 2012. (Id. at 853-63.) Plaintiff reported that his medication made his pain "dull for some time." (Id. at 853.) He could not stand for longer than five minutes, walk for longer than ten, and sit or drive a vehicle for longer than forty-five. (Id.) His medications included hydrocodone, Valium, Neurontin (a brand name for gabapentin), metoprolol,

lisinopril, and Cymbalta.  (Id. at 853-54.)  He was attending college and had finished three semesters.  (Id. at 854.)  He smoked a pack of cigarettes a day.  (Id.)  On examination, Plaintiff was in no acute distress when resting but wanted to sit down after standing up and doing some range of motion activities.  (Id.)  When standing, he held onto the examining table.  (Id.)  His mental state was clear; his memory was good.  (Id.)  On range of motion testing, Plaintiff could flex his lumbar spine to 60 degrees and bilaterally flex to the side on the left to 25 degrees and on the right to 20 degrees.  (Id. at 855, 857.)  Straight leg raises were positive at 40 degrees.  (Id.)  His gait was slow and with a limp.  (Id. at 855.)  He could get on and off the examining table without significant problems but could not squat more than halfway without pain in his lower back.  (Id.)  He could bear full weight on either leg for three to four seconds.  (Id.)  His range of motion in his knees, elbows, shoulders, hips, and cervical spine was no more than minimally diminished.  (Id. at 856-57.)  His handgrip and finger movements and strength were normal.  (Id. at 855, 856.)  Dr. Kim's diagnosis was (1) chronic lower back pain radiating to left lower extremity with history of lumbar disc surgery and lumbar spinal fusion, probable post laminectomy syndrome and (2) hypertension.  (Id. at 855.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Kim assessed Plaintiff as being able to frequently lift or carry up to ten pounds, occasionally lift up to fifty pounds, and occasionally carry up to twenty pounds.  (Id. at 858.)  Without interruption, he could sit for forty-five minutes, stand for five, and walk for ten.  (Id. at 859.)  Plaintiff could sit for a total of three hours during an eight-hour day and

stand or walk for one hour.  (Id.)  He did not need to use a cane.  (Id.)  Because of shoulder pain, with his right hand, he could frequently handle, finger, feel, push, or pull and occasionally reach.  (Id. at 860.)  He could do all those activities frequently when using his left hand.  (Id.)  He could occasionally use either foot to operate foot controls.  (Id.)  He could occasionally balance, stoop, kneel, and climb stairs and ramps.  (Id. at 861.)  He should never crouch, crawl, or climb ladders or scaffolds.  (Id.)  He could frequently be around unprotected heights and airborne irritants and occasionally move mechanical parts, operate a motor vehicle, and be exposed to humidity, wetness, vibrations, and extreme cold or heat.  (Id.)  He could, at a slow pace, engage in activities of daily living.  (Id. at 863.)

Also in June, Plaintiff underwent a psychological evaluation by John O. Wood, Psy.D.  (Id. at 868-74.)  Plaintiff explained that he has been dealing with symptoms of depression for the past twelve years.  (Id. at 871.)  The problems began when he and his wife of seventeen years separated in 2000 and divorced in 2002.  (Id.)  They were exacerbated by his 2006 injury preventing him from engaging in activities he formerly enjoyed and from obtaining or maintaining employment.  (Id.)  He worried that the fusion he had might cause him to become paralyzed.  (Id.)  He could not find a job because no one would hire him due to his back problems.  (Id.)  A recent CT scan had revealed that the screws in his fusion were bent.  (Id.)  He needed additional surgery, but could find no one to perform it and could not afford it.  (Id.)  His sleep was "'sketchy.'"  (Id.)  His primary care physician prescribed Cymbalta for his depression and diazepam for his anxiety.  (Id. at 872.)  Dr. Andreassen prescribed hydrocodone and Flexeril.  (Id.)  He did not drink, but did smoke marijuana once or twice a

week to manage his depression and pain and to relax.  (Id.)  His employment history included primarily factory work.  (Id. at 873.)  A worker's compensation claim arising from his 2006 injury was settled in 2008.  (Id.)  He had done some odd jobs, working at a convenience store in 2008 and as a census employee in 2010.  (Id.)  He lives with his father.  (Id.)  His son lived with him until he graduated from high school in May 2011.  (Id.)  He also has a grown daughter, with whom he has a strained relationship.  (Id.)  He spends his day watching television, playing video games, and lying down.  (Id.)  He does the household shopping and prepares the meals for himself and his father.  (Id.)  When school is in session, he attends classes from Monday to Friday.  (Id.)  He has a few friends that visit him during the day. (Id.)  On examination, Plaintiff was casually attired and exhibited signs of pain.  (Id.)  His mood was mildly depressed; his affect was somewhat flat; his eye contact was good; his speech was clear and discernible; his thought was logical and coherent.  (Id.)  He scored 29 out of 30 on the Folstein Mini Mental Status Exam – a score of 23 or less suggests the need for further assessment.  (Id.)  He was oriented to date, year, month, day, and place.  (Id. at 874.)  His immediate recall was fine.  (Id.)  On a delayed recall task, he could recall only two of the three words.  (Id.)  On a test of his attention and concentration, he could not complete serial sevens but could correctly spell "world" backwards.  (Id.)  Dr. Wood opined that Plaintiff appeared to be chronically depressed and showed signs of a dysthymic disorder. (Id.)  The depression was related to his ongoing pain.  (Id.)  Dr. Wood recommended that Plaintiff obtain a psychiatric evaluation to determine if his current medications were appropriate and consider obtaining supportive psychotherapy.  (Id.)  He diagnosed Plaintiff

with dysthymic disorder, pain disorder associated with psychological factors and a general medical disorder, and cannabis abuse.  (Id.)  His Global Assessment of Functioning was 58.[10] (Id.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Wood assessed Plaintiff as having no limitations in his abilities to understand, remember, and carry out instructions, regardless whether they were simple, detailed, or complex.  (Id. at 868.)  Nor did Plaintiff have any limitations in his abilities to interact appropriately with supervisors, the public, and co-workers and to respond to changes in the routine work setting.  (Id. at 869.)  No other capabilities were affected by his mental impairments.  (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2012, and has not engaged in substantial gainful activity since his amended alleged onset date of January 22, 2009.  (Id. at 17.)  He has severe impairments of degenerative disc disease of the lumbar spine and hypertension.  (Id.)  He did not, however, have a severe mental impairment.  (Id. at 19.)  Specifically, he did not have more than mild restrictions in his activities of daily living or more than mild difficulties in maintaining social

---

[10]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

functioning or in maintaining concentration, persistence, or pace. (<u>Id.</u>) In so finding, the ALJ gave great weight to the testimony of Dr. Perry, which was supported by the evaluation of Dr. Wood and the assessment of Dr. Lloyd. (<u>Id.</u>)

The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of listing-level severity. (<u>Id.</u> at 20.) He did have the residual functional capacity (RFC) to perform light work with limitations of lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; standing or walking no longer than six hours in an eight-hour workday with normal work breaks; and no more than occasionally stooping or climbing ramps or stairs. (<u>Id.</u>) When evaluating Plaintiff's RFC, the ALJ assessed his credibility and found it wanting on the grounds that (a) his activities of daily living were inconsistent with his allegations; (b) there was no objective medical evidence supporting the severity of his subjective complaints, including the lack of any evidence that his prescribed medications were not generally effective and were without side effects; (c) his minimal or conservative treatment during the relevant period was inconsistent with his allegations; (d) he worked after his amended alleged disability onset date; (e) he did not appear to be in any "obvious credible discomfort" during the hearings; and (f) there was no supporting lay testimony. (<u>Id.</u> at 21-22.) The ALJ gave weight to Dr. Fisher's testimony and opinion and little weight to the opinion of Dr. Kim, finding it to lack an objective medical basis and to be apparently based on Plaintiff's subjective complaints. (<u>Id.</u> at 22.)

With his RFC, Plaintiff cannot return to any past relevant work.  (<u>Id.</u> at 23.)  With his RFC, age,[11] and education, he can perform the jobs described by the VE.  (<u>Id.</u> at 24.)  Plaintiff is not, therefore, disabled within the meaning of the Act.  (<u>Id.</u>)

---

[11]Plaintiff was forty-eight years old at the time of the decision.

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment"

is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f),

416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

**Discussion**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he failed to properly weigh (a) the opinion of Dr. Kim and (b) his credibility. For the reasons set forth below, his arguments are unavailing.

The ALJ determined that Plaintiff has the RFC to perform light work with limitations of lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; standing or walking no longer than six hours in an eight-hour workday with normal work breaks; and no more than occasionally stooping or climbing ramps or stairs. This RFC echoed the RFC described by Dr. Fisher[12] and was generally less restrictive[13] than that of Dr. Kim, who concluded that Plaintiff could not stand, sit, and walk in combination for eight-hours.

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." **Perks v. Astrue**, 687 F.3d 1086, 1092 (8th Cir. 2012) (internal quotations omitted). Plaintiff does not argue that the

---

[12]Plaintiff argues that the nonexertional limitations in the ALJ's RFC varied without explanation from those of Dr. Fisher. The ALJ included in his RFC a reference to "climbing ladders, ropes, or scaffolds, kneeling, crouching, or crawling" without any qualification as to whether these activities could be done by Plaintiff and, if so, how frequently. Dr. Fisher testified that Plaintiff cannot perform these activities. Dr. Fisher also limited Plaintiff to only occasional bending; the ALJ did not include any reference to bending in his RFC. These omissions by the ALJ are not the fatal discrepancy represented by Plaintiff. As noted by the Commissioner, the VE was asked to assume a hypothetical claimant with the RFC described by Dr. Fisher and cited jobs that can be performed by a claimant with that RFC.

[13]Dr. Kim's RFC finding was less restrictive than Dr. Fisher's with respect to kneeling. Dr. Kim found Plaintiff could occasionally kneel; Dr. Fisher found he never could.

ALJ's RFC determination is not supported by some medical evidence; rather, he contends it is supported by the wrong medical evidence.

"It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007). One medical assessment may be given less weight than another if the latter is better supported by the record. **Hamilton v. Astrue**, 518 F.3d 607, 610 (8th Cir. 2008). Plaintiff correctly notes that Dr. Kim examined Plaintiff; Dr. Fisher did not.[14] This does not automatically require that Dr. Kim's opinion be given the greater weight. Two weeks beforehand, Plaintiff informed Dr. Samuel that he was doing okay. Dr. Kim found Plaintiff to have a slow gait and a limp. One week before, he had a normal gait and station. Four weeks later, he had a normal gait and station. Indeed, he usually had a normal gait and station when being seen by an APC provider. See **Finch**, 547 F.3d at 937, 938 (ALJ did not err in discounting physician's opinion limiting claimant to standing for no longer than fifteen minutes at a time when records showed normal leg strength and gait). Dr. Kim limited Plaintiff to sitting for forty-five minutes at a time, yet Plaintiff was able to attend college classes without accommodations. Dr. Kim

---

[14]Citing **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010), Plaintiff argues that the opinions of doctors who evaluate the claimant without an examination are not substantial evidence on the record as a whole. **Vossen** cited **Shontos v. Barnhart**, 328 F.3d 418, 427 (8th Cir. 2003). In **Shontos**, the ALJ relied on his own unsupported inference from the medical records and on the opinions of non-treating, non-examining medical consultants rather than the three consistent opinions of claimant's own treating professionals. The question in **Vossen** was whether the ALJ erred when relying on the opinion of a non-treating, non-examining physician after rejecting the opinion of the examining consultant on the grounds the relevant portion of the latter was not authenticated. The Eighth Circuit held that the proper course was to contact the consultant for clarification. Neither **Vossen** nor **Shontos** involved an ALJ's decision to credit the report of a non-treating, non-examining physician over that of an examining consultant on the grounds that the latter was not supported by the record – a valid consideration.

limited Plaintiff to standing for five minutes, yet Plaintiff reported he cooked and had moved furniture earlier that year.  See **Whitman v. Colvin**, 762 F.3d 701, 706 (8th Cir. 2014) (ALJ properly discounted opinion of consultative examiner who assessed claimant as having greater limitations than indicated by claimant's activities).

A physician's opinion may be given less weight if it is "'based largely on [the claimant's] subjective complaints rather than on objective medical evidence.'"  **Cline v. Colvin**, 771 F.3d 1098, 1104 (8th Cir. 2014) (quoting Kirby, 500 F.3d at 709).  This was the reason cited by the ALJ for discounting Dr. Kim's opinion, and it is a reason that is supported by the record.

After citing Social Security Ruling 96-7p, which includes the *Polaski* factors,[15] see page 36, supra, the ALJ gave several reasons for discounting Plaintiff's credibility.  One was the lack of supporting objective medical evidence.[16]  This is a factor, although not one to be relied on solely, that may properly be considered.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008).  Another was Plaintiff's activities of daily living.  "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'"  **Bernard v. Colvin**, 774 F.3d 482, 489 (8th Cir. 2014) (quoting Johnson v. Apfel, 240 F.3d

---

[15]See **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013) (having stated that he considered the *Polaski* factors, the ALJ was not required to discuss each factor's weight in his credibility determination).

[16]The Court notes that included in the lack of supporting objective medical evidence were Plaintiff's consistent reports to his treating physician and to his APC providers that his medications were controlling his pain and depression and had no side effects.  See **Myers**, 721 F.3d at 527 (ALJ did not err in discounting claimant's credibility based, in part, on evidence that she responded to and benefitted from drug therapy).

1145, 1148 (8th Cir. 2001)). Plaintiff argues that the ALJ erred in this consideration because his minimal activities are not inconsistent with his testimony. Plaintiff testified that he prepared meals, did laundry, and went grocery shopping. In **Bernard**, the court found that the ALJ had not erred in considering the claimant's daily activities "such as caring for his personal hygiene, preparing meals, washing dishes, mowing the lawn, shoveling snow, grocery shopping, using public transportation, handling finances, watching television, playing games, and performing maintenance work at his apartment building" as detracting from his credibility. 774 F.3d at 489. In the instant case, Plaintiff cared for his personal hygiene, prepared meals, washed clothes, shopped for groceries, drove, attended college classes, and, according to his medical records, sometimes worked on cars and used the computer. See **Tennant v. Apfel**, 224 F.3d 869, 871 (8th Cir. 2000) (affirming adverse credibility determination based in part on part-time college attendance by claimant alleging disabling pain and fatigue); accord **Baker v. Apfel**, 159 F.3d 1140, 1145 (8th Cir. 1998).

Another consideration detracting from Plaintiff's credibility was his demeanor at the hearings. Although a claimant's "failure to 'sit and squirm' with pain during the hearing cannot be *dispositive* of his credibility," **Muncy v. Apfel**, 247 F.3d 728, 736 (8th Cir. 2001) (emphasis added), "[t]he ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations," **Johnson**, 240 F.3d at 1147-48. As is clear from the ALJ's decision, his observations of Plaintiff at the two hearings, four months apart, was *a* factor, not *the* factor, in his credibility determination. There is no error.

Citing **Pate-Fires**, 564 F.3d at 945-46, Plaintiff further argues that there is error in the ALJ considering his conservative treatment as a detractor from his credibility because the lack of treatment may be the result of a mental illness, i.e., his depression.  In **Pate-Fires**, "the ALJ failed to make the critical distinction between the [claimant's] awareness of the need to take her medication and the question whether her noncompliance with her medication was a medically-determinable symptom of her mental illness."  **Id.** at 945.  The claimant had a lengthy history of mental health treatment, including four involuntary hospitalizations, and of noncompliance with treatment.  In the instant case, however, Plaintiff has continually pursued only medication treatment for relief of his pain and depression.  He generally takes the prescribed medications and keeps his appointments.  There is nothing in the record to support his current argument that the nature of his treatment is affected in any way by his depression or his anxiety.  See **Pratt v. Astrue**, 372 Fed. App'x 681, 682 (8th Cir. 2010) (per curiam) (holding that ALJ's credibility finding was supported by, inter alia, lack of mental health treatment); **Spradling v. Chater**, 126 F.3d 1072, 1075 (8th Cir. 1997) (finding that claimant's failure to seek more aggressive treatment for complaints of disabling pain detracted from credibility).

Because the ALJ's credibility determination is "supported by good reasons and substantial evidence," this Court will defer to it.

## Conclusion

Considering all the evidence in the record, including the evidence before the Appeals Council, the Court finds that there is substantial evidence to support the ALJ's decision.  "If

substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of February, 2015.